# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| BRUNETTA BELL,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>MINNEAPOLIS PUBLIC SCHOOLS,<br><br>　　　　　　　Defendant. | Civil No. 03-6320 (JRT/FLN)<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Stephen M. Thompson and Tammy P. Friederichs, **FRIEDERICHS & THOMPSON, PA**, 1120 East 80th Street, Suite 106, Bloomington, MN 55420, for plaintiff.

Marc M. Berg, **JAMES C. SELMER & ASSOCIATES**, PA, 500 Washington Avenue South, Suite 2010, Minneapolis, MN 55415, for defendant.

Plaintiff Brunetta Bell brought this lawsuit against her former employer, defendant Minneapolis Public Schools ("MPS"), alleging race discrimination in employment, harassment and hostile work environment, and retaliation and reprisal in violation of the Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*; and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A *et seq.* MPS moves for summary judgment on all of Bell's claims. For the reasons discussed below, the Court grants MPS's motion for summary judgment.

## BACKGROUND

Bell, an African-American woman, began working for MPS in January 1995 as a school nurse, and split her time between various schools until the end of the 1997-1998 school year. During these first few years with MPS, management received complaints regarding Bell's nursing practices and communication style, however, MPS took no formal disciplinary measures at that time.

Bell bid into a full-time position at North High School for the 1998-1999 school year. Shortly after she began that assignment, her supervisors, Health Service Area Leader Karen Johnson[1] and North High School Principal Birch Jones, started receiving complaints from students and staff about Bell's nursing practices and communication style, which was described as "abrasive," and included "yelling" and "put-downs." In particular, Shoko Stromberg, a Health Services Assistant and Bell's subordinate, felt "humiliated" by Bell, and complained to Johnson about Bell's treatment of her.

In response to the complaints, Jones and Johnson placed Bell on a Professional Support Process ("PSP"), which is a form of peer review that "provides support for employees who are experiencing challenges that require expanded collegial assistance."[2] Despite being on a PSP, which also included measures such as a consultation with a conflict resolution consultant, Bell's rapport with students and colleagues did not

---

[1] The Health Services Area Leaders functioned as an additional layer of management between the Director of Health-Related Services, Sara Mullet, and the nurses.

[2] The employment relationship between MPS and school nurses is governed by the Teacher Tenure Act, Minn. Stat. § 122A.41, and the collective bargaining agreement ("CBA") between the Minneapolis Federation of Teachers ("MFT") and MPS. Under the Teacher Tenure Act and the CBA, teachers and nurses are subject to mandatory peer review. Each tenured teacher and nurse must have in place a Performance Development Plan ("PDP"). When a teacher or nurse requires "expanded collegial assistance," the PDP is replaced with a PSP.

improve, and her communication style continued to be described as "hostile," "aggressive" and "confrontational" by co-workers and supervisors.

Bell's relationship with Johnson and Jones, as well as Elizabeth Zeno, another Health Services Area Leader, deteriorated. Bell felt that they were not supporting her as they should have, and made statements to them on various occasions that she felt they were treating her in a racially discriminatory way. Johnson, Jones and Zeno continued to attempt to monitor Bell's conduct and progress on her PSP, but Bell began to feel that their supervision constituted racially-motivated "harassment." Bell asked her supervisors to leave her office on more than one occasion, and requested they schedule appointments if they wished to meet with her.

Bell retained an attorney, who sent a letter to MPS dated December 30, 1999, regarding Bell's concerns. Bell's supervisors decided to involve MPS's Labor Relations Department, and on January 25, 2000, the Labor Relations Department placed Bell on a paid suspension and directed that an outside investigator, Caroljean Coventree, look into the complaints about Bell. During the spring of 2000, Coventree interviewed several individuals, including Bell, and on May 23, 2000, Coventree provided an executive summary of her investigation to Allen Giles, MPS District Counsel. Coventree reported that there was evidence to support the concerns regarding Bell's nursing practices and communication style, however, the evidence did not show that Bell had engaged in any serious misconduct with respect to her nursing practices. Coventree also reported that the evidence did not support Bell's allegations of racial discrimination, noting that Zeno had investigated nursing practice concerns regarding a Caucasian nurse in a similar fashion to

Bell. As a result of Coventree's investigation, MPS Director of Labor Relations Michael Goar placed Bell on a three-day unpaid suspension, which she served in October 2000.

For the 2000-2001 school year, Bell left North High School and bid into a new position.[3]  Bell's relationship with colleagues did not improve in her new positions. Although Bell received positive feedback from some of the private schools where she served, Bell received very negative evaluations from others. For example, the principals of both Saint Elizabeth Seton and Risen Christ sent letters to MPS requesting that Bell not return after the end of the school year. In addition, Bell was involved in a dispute with the program administrator at Transition Plus, Sheryl Evelo, and another Health Services Area Leader, Cecilia Erickson, in which Bell initially refused to teach the class. Evelo subsequently requested that Bell not return to Transition Plus after the school year.

During this same time frame, in September and December of 2000, Bell had filed charges with the EEOC, the first alleging discriminatory discipline, and the second alleging retaliation. Both of these charges were later dismissed, and Bell did not bring a lawsuit within the 90-day right-to-sue period.

In April 2001, MPS commenced a second independent investigation into Bell's performance. The investigator, Jesse Gant, was asked to investigate "allegations of professional incompetence and misconduct," including four "primary areas": (1) failure to examine a student with a skin condition per a principal's request, (2) communication issues, (3) sight evaluation/testing and inaccurate entry of medical data, and (4) lost medical records. In the investigation report, Gant stated that nurses and supervisors

---

[3] It is undisputed that Bell could have returned to North High School if she wished, and that her change in position was not disciplinary in any way. Rather, Bell states she decided to change positions to avoid the "hostile environment" she experienced there.

described Bell as "overly defensive, abrasive, rude, does not ask for help when she needs it," and that this behavior leads to mistakes in charting screening test results. Moreover, other nurses stated that Bell "blatantly disrespects her supervisors, including Director Mullett, by her tone of voice and body language."

After receipt of the report, MPS Labor Relations Director began steps to terminate Bell. MPS claims that it believed that termination was appropriate because the Gant investigation revealed a sufficient basis for discharge, and the misconduct set forth in the Gant investigation report was "similar" to the misconduct set forth in the first independent investigation, such that MPS believed that Bell would not correct her workplace behavior in response to further disciplinary measures.

The 2000-2001 school year ended on June 6, 2001. On June 7, 2001, Goar sent Bell a certified letter notifying her of a *Loudermill* meeting[4] to take place the following Tuesday, June 12, 2001, to discuss allegations of inappropriate conduct on her part, and to give her an opportunity to respond to those allegations.

On August 14, 2001, Goar sent Bell a certified letter notifying her of MPS's "proposal" to terminate her. This letter also notified Bell of her right to contest the decision before the Board of Education or an arbitrator. The Board approved the discharge decision on August 15, 2001. Bell requested arbitration on August 23, 2001, however, the arbitration never took place.

On July 2, 2002, Bell filed charges of discrimination with the EEOC and the Minnesota Department of Human Rights ("MDHR"), alleging, inter alia, that her

---

[4] *Loudermill* meetings provide public sector contract employees with fair notice of charges that might lead to discipline or discharge, as well as an opportunity to respond to those charges. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).

termination from MPS was motivated by racial discrimination and/or retaliation. On September 13, 2003, the EEOC dismissed the charge after conciliation efforts had failed. Bell commenced this lawsuit on November 25, 2003, asserting claims of race discrimination, hostile work environment, and retaliation.

## ANALYSIS

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate in the absence of any genuine issue of material fact and when the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view all of the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II.   RACE DISCRIMINATION UNDER TITLE VII AND THE MHRA

Claims of race discrimination under Title VII and the MHRA are analyzed under the *McDonnell Douglas* burden-shifting framework. *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Griffith v. City of Des Moines*, 387 F.3d 733, 736-37 (8th Cir. 2004) (reaffirming that claims under Title VII, including race discrimination claims, are analyzed under *McDonnell Douglas*); *Clearwater v. Indep. Sch. Dist. No. 166*,

231 F.3d 1122, 1124 n.2 (8th Cir. 2000) (noting that race discrimination claims under the MHRA are analyzed under the Title VII standard).[5]  Under *McDonnell Douglas*, the plaintiff first is required to establish a prima facie case of discrimination.  The burden of production then shifts to defendant to assert a legitimate reason for the allegedly discriminatory action.  *McDonnell Douglas*, 411 U.S. at 802.  If the defendant is able to do so, the burden shifts back to the plaintiff to establish that the asserted legitimate reason was merely a pretext for a discriminatory action.  *Id.* at 804.

**A.    Race Discrimination**

In order to establish a prima facie case of race discrimination, Bell must demonstrate that (1) she is a member of a protected class; (2) she was qualified for the job in question; (3) she suffered an adverse employment action; and (4) the facts permit an inference of discrimination.  *Taylor v. Southwestern Bell Tel. Co.*, 251 F.3d 735, 740 (8th Cir. 2001).

---

[5] As an initial matter, MPS argues that Bell's Title VII claims are time-barred because she did not file her charge of discrimination with the EEOC within the 300-day deadline under 42 U.S.C. § 2000e-5.  MPS sent Bell a letter dated August 14, 2001, stating that it "proposes" to terminate Bell for cause, and that she would be suspended without pay pending the results of a hearing or arbitration.  MPS argues that August 15, 2001 is the date of Bell's termination, and that because she did not file her charge with the EEOC until July 2, 2002, it is time-barred.

Bell responds that she requested arbitration and that it was scheduled to take place during Fall 2001.  On October 19, 2001, Bell claims she telephoned Goar, then Director of Labor Relations at MPS, and that he verbally informed her that she had been terminated.  Bell argues that October 19, 2001 is the date of her termination.

The Minnesota courts do not appear to have addressed this precise issue.  However, the letter, by its own terms, "proposes" Bell's termination.  Notably, the letter does not state, as one would expect under MPS's interpretation, that Bell was terminated, or that she would be terminated effective on a particular date.  Based on the plain meaning of the letter, the Court holds that Bell was not terminated until October 19, 2001, and accordingly, her Title VII claims are not time-barred.

It is undisputed that Bell belongs to a protected class, she is a licensed nurse, her termination constituted an adverse employment action, thus satisfying three of the four elements of the prima facie case. Bell also argues that she felt she was being discriminated against based on her race, and she identified at least one other person of a different race, Lisa Kocun, who Bell claims received different and better treatment than Bell. Specifically, Bell asserts that Kocun was also placed on a PSP for communication and interpersonal issues, but that she was not terminated. These allegations satisfy the fourth element of the prima facie case.

Therefore, the burden shifts to MPS to articulate a legitimate, nondiscriminatory reason for her termination. MPS has offered evidence showing that students, subordinates, co-workers, and her supervisors perceived Bell as "abrasive" and "confrontational." Bell's pattern of behavior did not improve or change with time, or with changes in location or supervisors. Further, nurses employed by MPS are provided procedural safeguards under the Teacher Tenure Act and the Collective Bargaining Agreement. Although Bell may have wished that her supervisors took additional steps to "support" her in improving her interpersonal and communication style, it is undisputed that Bell received the required procedural safeguards at least until the August 14, 2001 letter. Finally, and perhaps most importantly, MPS set forth evidence showing that Kocun, whom Bell had identified as a similarly-situated nurse who was not terminated, was not in fact comparable to Bell. First, Kocun was placed on a PSP because she was not being assertive enough in dealing with subordinates. Second, Kocun successfully

completed her PSP, and therefore was not suspended or subjected to any external investigation.

Because MPS has articulated a legitimate, nondiscriminatory reason for Bell's termination, the burden shifts back to Bell to show that the asserted reason was actually a pretext for discrimination.

The Court finds that Bell has failed to allege facts showing that MPS's articulated reason for her termination is pretextual. To the contrary, Bell does not appear to dispute that, over the years, many individuals from a number of different positions and schools complained about Bell's interpersonal and communication style. Similarly, Bell does not dispute that the issues identified in those complaints did not improve or change over time, and that two separate, independent investigations reached the same conclusion. Finally, Bell does not dispute MPS's evidence showing that Kocun, whom Bell had identified as a similarly-situated nurse, was not in fact comparable to Bell. In sum, Bell's assertions that she felt that she was being singled out because of her race are simply that: conclusory statements, unsupported by specific factual allegations.

Therefore, the Court grants MPS's motion for summary judgment on Bell's racial discrimination claims.

**B.     Harassment and Hostile Work Environment**

Harassment of an employee based on race is prohibited conduct under Title VII and the MHRA. Hostile work environment harassment occurs when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

working environment." *Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations omitted)). To prevail on her hostile work environment claim, Bell must present evidence that: (1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) the existence of a causal nexus between the harassment and her protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take proper action.[6] The complained of conduct must have been severe or pervasive enough to create an objectively hostile work environment. *Harris*, 510 U.S. at 21. The party opposing summary judgment must provide sufficient probative evidence to permit a verdict in its favor rather than relying on conjecture and speculation. *Palesch*, 233 F.3d at 568.

Bell's only specific examples of harassing conduct are her supervisors attempting to meet with her in her office regarding her PSP. These allegations, without more, do not give rise to a claim of harassment or a hostile work environment claim. *Cf. Palesch*, 233 F.3d at 567 (finding that employer's actions in commencing investigation and disciplinary measures of employee did not constitute unlawful harassment or hostile environment). Therefore, the Court grants MPS's motion for summary judgment on Bell's claims of harassment and hostile work environment.

---

[6] This final element applies to allegations of non-supervisory harassment, but not to allegations of supervisory harassment. *See Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir. 1999). Thus, to the extent Bell claims harassment by her supervisors, she need not prove her employer knew or should have known of the harassment.

**C.     Retaliation and Reprisal**

The *McDonnell-Douglas* burden-shifting framework also applies to claims of retaliation or reprisal under Title VII and the MHRA.  *Turner v. Gonzales*, 421 F.3d 688, 695 (8th Cir. 2005); *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 548 (Minn. 2001).  A prima facie case of retaliation or reprisal requires a plaintiff to demonstrate that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between her protected conduct and the adverse action.  *Turner*, 421 F.3d at 695-96.  Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions, and then shifts back to the plaintiff to show that the defendant's reason was pretextual.  *Id.*

There is no dispute that Bell engaged in protected activity by filing charges with the EEOC about race discrimination in September and December 2000, and that she suffered an adverse employment action when she was terminated.  The issue here is whether Bell has demonstrated a "causal connection" between the two.  Bell argues that a causal connection may be inferred based on the temporal proximity between her complaints and the disciplinary action.  Bell also argues that her claim of retaliation is supported by the allegations she made regarding her race discrimination claims.

Assuming *arguendo* that Bell has demonstrated a prim facie case, the burden shifts back to MPS.  As set forth above, MPS has provided a legitimate, nondiscriminatory reason for the investigations into Bell and her subsequent termination:  Bell had persistent and ongoing interpersonal and communications issues with her coworkers.

The burden returns to Bell to demonstrate the articulated reason is pretextual. The Court finds that Bell has not met her burden. Bell does not dispute that numerous individuals, over a period of years, and in a number of different locations, found her personal style hostile, intimidating, and confrontational. Bell similarly does not dispute that these issues did not improve, despite having different supervisors, and being placed on a PSP.

Accordingly, the Court grants MPS's motion for summary judgment on Bell's retaliation and reprisal claims.

**ORDER**

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Docket No. 28] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:   March 20, 2006                             s/ John R. Tunheim         _
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                    United States District Judge